BENJAMIN F. MOORE, Plaintiff-Appellee, v. THE DEPARTMENT OF
DRIVER SERVICES *et al.*, Defendants-Appellants.

First District (6th Division)   No. 1—89—1622

Opinion filed July 20, 1990.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, So-
licitor General, and Linda J. Hay, Assistant Attorney General, of Chicago,
of counsel), for appellants.

Julius Lucius Echeles, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Benjamin F. Moore, sought review pursuant to the Secretary of State Merit Employment Code (Ill. Rev. Stat. 1987, ch. 124, par. 101 *et seq.*) of a notice of proposed discharge which was issued to him by defendant Illinois Secretary of State Department of Driver Services (Department). Following a hearing, a hearing officer recommended that Moore be discharged. Plaintiff filed exceptions to the recommended decision with defendant Illinois Merit Commission of the Secretary of State (Commission). The Commission agreed with the hearing officer's recommended decision to discharge Moore. On administrative review (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*), the trial court reversed the decision of the Commission.

In February 1988, Moore received a notice of proposed discharge from the Department. The notice charged that Moore had: unlawfully and without authority solicited $500 for a fraudulent driver's license from Mary Woolery; unlawfully and without authority completed a driver's license application in the name of Gary C. Young for Gralyn Simpson without obtaining or reviewing proper identification; conspired with Eugene Richardson, Eddie Jones, Andrew Farmer and James Cokely to prepare and issue fraudulent driver's licenses to Mary Woolery, Gralyn Simpson and other persons in return for various amounts of money; and neglected his duties as a public service supervisor by participating in, allowing to occur and failing to report the illegal sale of fraudulent driver's licenses, and by failing to properly supervise his subordinates.

Initially, we note that two of the foregoing charges are not involved in this appeal. The hearing officer found that the charge that Moore had completed a fictitious license application in Simpson's behalf and that the charge of conspiracy had not been proved. The officer based his rulings on the basis that Simpson was a deceptive witness and, accordingly, that Simpson's testimony was incredible. The Department does not appeal these rulings and, therefore, the testimony concerning those charges will be discussed only to the extent it affects the charges at issue in this appeal.

At the hearing, Moore testified that on February 1, 1988, he was employed as a driver's license facility supervisor at the Charles Chew, Jr., facility. Moore had been a Department employee for 14 years and had been a supervisor for 11 of those years. Moore's responsibilities as a supervisor included handling day-to-day operations of the facility, employees, evaluations, and accounting procedures. Additionally, he

wrote up applications, checked identification and handled general problem solving. On occasion, Moore administered written tests and eye tests.

Moore stated that the correct procedure for issuing a driver's license required that a Department employee review an applicant's identification. He testified that a supervisor may have the authority to issue a license without the proper identification. He indicated that this was a longstanding practice. If an applicant did not have the proper physical identification, Moore would make telephone calls, check computer records, or somehow verify that the applicant was telling the truth. Moore had issued licenses in this manner on 400 to 500 occasions.

Mary Woolery, a special agent for the Illinois State Police, Department of Criminal Investigations, testified that she first visited the Chew facility on March 24, 1987, with Andrea Harris. She went there in order to plan the purchase of a fictitious driver's license which would include her photograph along with a false name and address.

Woolery stated that on March 24, she and Harris met with James Cokely, an examiner, and Eugene Richardson, a supervisor at the facility. The two women brought a television set with them. The television set had been purchased by the police and was to be given to another Department employee, Gloria Williams, as payment for a previously purchased fraudulent driver's license. Cokely took the set out of Woolery's car. Woolery saw Moore on March 24, but she did not meet with him. She observed Harris meet and talk with Moore, but could not hear the conversation.

On March 25, Woolery and Harris returned to the Chew facility to purchase a fraudulent driver's license. They met with Richardson, and then Harris and Moore conversed. On this occasion, Woolery was able to hear their conversation. She heard Moore say that "John was all over him today and he can't do anything today." She saw Moore give Harris a piece of paper, and heard Moore tell Harris to call him later. Harris gave Woolery the slip of paper, which had a Chew facility telephone number on it.

On March 26, Woolery returned to the Chew facility. Another agent was with her, but remained in the car while Woolery went inside. Woolery met with Moore in the parking lot between the two buildings which housed the facility. Woolery asked Moore if "he could do anything today." Moore replied that he could not because there were a lot of things going on around the facility. Woolery asked when would be a better time, and Moore responded that he did not know, but that he could not do it that day. She asked if she could contact

him at another time, and he replied that she could do so. Woolery did not at any time give Moore money for a fraudulent driver's license.

Harris also testified at the hearing. She explained that she had become involved in this investigation after being stopped by a police officer with a fictitious driver's license in her possession. In exchange for her cooperation in the investigation, the Secretary of State, through Special Agent Frank Murphy, gave her $100 for every fictitious license she bought. Harris stated that she had been convicted of forgery in the past and was currently incarcerated on pending forgery charges to which she had pleaded guilty. Harris stated that she had not been promised anything in return for her testimony.

Harris testified that she knew Moore because she had bought fraudulent licenses previously at the Chew facility. She never paid Moore directly for these licenses. Harris stated that on March 24, 1987, she and Woolery went to the Chew facility. They brought $500 to purchase a fraudulent license, and a television set which Harris owed to Williams as payment for a previously purchased fictitious license.

Harris stated that when she and Woolery arrived, Harris met with Cokely and told him that she wanted to do some business and to straighten out her tab with Williams. Cokely informed her that Williams was angry about the television set and felt that Cokely, Richardson and Moore owed Williams some money for providing Harris with a license. Cokely then brought Richardson to meet with Harris and Woolery. Richardson left shortly thereafter, explaining that he had to talk to Moore. When he returned, Moore was with him. Moore told Harris that Williams was angry about the television. Harris told Moore that the television was in her car. She told Moore that she wanted to keep doing business and also asked him how much the license would be. Moore told her it would be $500. Harris did not give Moore the $500, and Moore did not give her a fictitious driver's license. Harris later purchased a fictitious driver's license from Cokely and Richardson for $500. Moore was not present during the transaction.

Special Agent Murphy testified that he and another agent interviewed Moore at the Chew facility on January 22, 1988. They read Moore his rights, and Moore agreed to talk to them. Moore indicated that he was not aware that fraudulent license sales currently were occurring at the facility. Murphy showed Moore a group of photographs of women. Moore recognized Woolery's picture and said that he might know her because he thought she was the woman he had told not to hang around the facility.

Murphy stated that Moore told him he had no authority to write up a license application without checking the applicant's identity. Moore also stated that three forms of identification generally are required, but in special cases, two forms are sufficient when the applicant is known by the supervisor or the employee. Moore told Murphy that he would never write up an applicant without at least two forms of identification and verification.

When asked about the conversation with Murphy, Moore stated that he told Murphy the application requirements sometimes were waived. Moore also informed Murphy that he had reported certain rumors that a fictitious license had been sold in 1986 or 1987. Moore stated Murphy had acknowledged that Moore had done so.

With regard to the charges involved in this appeal, the hearing officer found that the Department proved that Moore had indirectly solicited $500 from Woolery. Additionally, the hearing officer found that Moore had failed to report suspicions regarding the illegal sale of fraudulent licenses and the illegal sale transaction involving the television set. The Commission adopted the hearing officer's findings except that the Commission found that Moore had no duty to report rumors.

We believe that a fundamental error occurred in that there was a substantial variance between the administrative charges against Moore and the proof presented at the hearing. As to the first charge, Moore was accused of soliciting $500 from Woolery in exchange for a fraudulent license, yet the proof adduced at the hearing established that Moore never solicited $500 from Woolery. The trial court noted that this variance was key and serious. In fact, the trial court believed the variance to be a denial of due process and, therefore, to be fatal to the claim. The court nevertheless based its decision to reverse the Commission's decision on its conclusion that the Commission's findings were contrary to the manifest weight of the evidence.

We hold, however, that the variance between the charge and the proof adduced at the hearing denied Moore procedural due process and requires reversal of the Commission's finding that Moore was guilty of soliciting a bribe from Woolery.

■■ ■ Procedural due process in an administrative proceeding does not require a proceeding in the nature of a judicial proceeding but is satisfied by a form of procedure that is suitable and proper for the nature of determination to be made and conforms to fundamental principles of justice. (*Telcser v. Holzman* (1964), 31 Ill. 2d 332, 201 N.E.2d 370.) In administrative proceedings, a complaint need not state the charges with the same refinements and selectivity as a com-

plaint in a court of record. (*Ballin Drugs, Inc. v. Department of Registration & Education* (1988), 166 Ill. App. 3d 520, 519 N.E.2d 1151; *Irving's Pharmacy v. Department of Registration & Education* (1979), 75 Ill. App. 3d 652, 394 N.E.2d 627.) Nonetheless, an administrative complaint must reasonably apprise the party of the case against him so that he will be able to intelligently prepare his defense. *Talman v. Department of Registration & Education* (1979), 78 Ill. App. 3d 450, 397 N.E.2d 151; see also 107 Ill. 2d R. 133(a).

Here, the charge filed against Moore, alleging that he had solicited $500 from Woolery, did not reasonably apprise him of the case against him. On March 24, 1987, Woolery and Harris went to the Chew facility and brought with them $500 to purchase a fraudulent license for Woolery, and a television set to pay another employee for a previously purchased fraudulent license. According to Harris, she met with Moore and he told her that a license would be $500. Woolery was not present at this meeting. The next day, Woolery and Harris returned to complete the transaction. Woolery heard Moore tell Harris that he could not do anything that day. Moore gave Harris a piece of paper with a Chew facility telephone number on it. No transaction occurred. Woolery returned to the facility the following day and asked Moore if he could do anything for her. He said that he could not because there were a lot of things going on, but he told her she could contact him at another time. Again, however, no transaction occurred. Thus, Moore met with Woolery only once. He did not discuss with her the price of a fictitious license or accept $500 in exchange for a fictitious license. At no time did Woolery pay Moore $500 for a fraudulent license.

■ The Department's case against Moore varies significantly from the charges which it filed against him and denied him due process of law. The charge that Moore solicited $500 from Woolery cannot be said to have reasonably apprised him of the case against him when that case involved proof that he solicited a bribe from Harris. The substance of the two situations is distinct and a charge outlining one situation could not have informed Moore of the conduct involved in the other. (See *Northtown Ford v. Human Rights Comm'n* (1988), 171 Ill. App. 3d 479, 525 N.E.2d 1215 (stating that an amended charge adequately apprised defendant of the charges against him when the substance of the action alleged remained the same); *Slager v. Pollution Control Board* (1981), 96 Ill. App. 3d 332, 421 N.E.2d 929 (stating that a charge which incorrectly defined refuse as "garbage and other discarded materials" rather than as "hazardous wastes, liquid wastes and sludges" adequately apprised defendant of

the case against him as the charge specifically informed the defendant of the manner in which his conduct was alleged to violate the Environmental Protection Act).) We do not believe that Monroe was able to intelligently prepare his defense with respect to that charge. See *Wierenga v. Board of Fire & Police Commissioners* (1976), 40 Ill. App. 3d 270, 352 N.E.2d 322 (stating that plaintiff could not be discharged for violating a section of the municipal code when the statutory violation was neither alleged in the charges filed against plaintiff, nor mentioned at the hearing).

Accordingly, we find that the trial court properly reversed the Commission's determination that Moore solicited a bribe from Woolery.

With regard to the remaining charge, that Moore was derelict in his duties as a public service supervisor, we find that there was also a failure of proof. The charge that Moore was derelict in his duties because of his failure to report the illegal sale of fraudulent licenses is not supported by the record.

The charge provided as follows:

> "That you were, at various times between at least January 1, 1987, and continuing until January 21, 1988, derelict in your duties as a Public Service Supervisor in the Chicago South facility by participating in, allowing to occur, [*sic*] to properly supervise you [*sic*] subordinates, and failing to report the illegal sale of fraudulent Illinois drivers license * * *."

The hearing officer determined that the charge had been proved by evidence that Moore was suspicious of certain employees and had failed to report his suspicions, and that he was made aware of an illegal transaction involving another employee and a television set but had failed to report the transaction. The Commission limited the hearing officer's conclusion and found only that Moore had a duty to report the conversations he had with Harris regarding the television set transaction and the price of a driver's license.

Even if we were to assume that Harris' testimony was credible, and in view of her past record and her taking of the fifth amendment during her testimony that is difficult, her testimony does not establish the charge of failing to report the illegal sale of fraudulent driver's licenses. (See *Prince Manufacturing Co. v. United States* (E.D. Ill. 1977), 437 F. Supp. 1041 (burden of poof is on complainant in a complaint proceeding before an agency).) The conversation regarding the television set was in no way connected to any such sale. The testimony merely established that Moore knew Williams was angry about a television set. There was no testimony that Moore was

informed of the underlying transaction. Furthermore, although Harris testified that she asked Moore how much a license would be, and that he replied $500, this conversation, even if true, does not establish that a sale occurred. And, although Harris testified that she purchased a fictitious license from Cokely and Richardson later that day, she did not testify that Moore was in any way involved in that transaction. Rather, Harris testified that Moore would not agree to the sale of a fictitious license on either day. Thus, the testimony did not establish that Moore sold a license or that he was aware of any such sale. Moore cannot be said to have failed to report a sale which never occurred, nor can he be said to have failed to report a sale of which he was not aware.

We find that the trial court properly reversed the Commission's decision to discharge Moore based on dereliction of his duties as a Public Service Supervisor. Because we have so concluded, we need not determine whether there was a sufficient basis for the conclusion that cause for discharge existed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.